# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00544-CR

**Jesse Amador Maldonado, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. CR2017-765, THE HONORABLE DANIEL H. MILLS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Jesse Amador Maldonado challenges his conviction for aggravated kidnapping. Tex. Penal Code § 20.04. The jury found him guilty, he pleaded true to the enhancement paragraph, and the jury assessed punishment at thirty years' imprisonment. *See id.* § 12.42(c)(1). Maldonado contends in two issues that the trial court erred when it excluded testimony as to the victim's reputation for truthfulness and when the trial court denied Maldonado's requested mistake of fact instruction. We will affirm the trial court's judgment of conviction.

## BACKGROUND

Amanda Lester testified that she and her boyfriend Kevin Kelly were arguing the morning of July 30, 2017. Kelly was driving Lester from his parents' house in San Antonio to her home near Austin. The couple's fight continued until Kelly pulled the car over while still in

San Antonio and removed Lester's belongings from the car. After Lester exited the vehicle, Kelly drove away. Lester was not familiar with the area and could not reach Kelly on the phone.

A driver stopped his car and asked Lester if she wanted a ride. Lester accepted and got in the car. Maldonado's identity as the driver that picked up Lester that day was later determined by detectives and then corroborated by Lester through a photo lineup. Lester testified that soon after Maldonado began driving towards Lester's home, Lester became "really scared," "had a really bad feeling," and "could just tell there was something really wrong." Lester asked Maldonado to stop the car and let her out but he would not. After Lester asked "[a]bout twenty times" to be let out of the car, Maldonado pulled over into a neighborhood drive. However, when he realized it was a gated community, he turned around and pulled back onto the road towards Lester's home without stopping the car.

Maldonado kept telling Lester he would stop at a gas station, but Lester did not believe him because they "passed so many gas stations." Lester threatened to hit Maldonado if he did not let her out of the car. Maldonado replied, "What, no BJ?" Lester testified that she understood "BJ" to mean oral sex. Maldonado then grabbed Lester's ponytail and "shook [her] head in his lap." When Lester pushed herself out of his lap, Maldonado punched her in the face and Lester testified that it hurt and "felt like [her] jaw was broken."

Lester attempted to unlock the doors but Maldonado kept locking them. When Lester was able to open the car door, she held it open with her foot. Maldonado grabbed her by her arm to keep her in the car. Lester was wearing her purse on her shoulder and when the strap broke from Maldonado grasping it tightly, he threw it out the open car door.

Lester testified that she then called 911 on her cell phone, holding the phone away from Maldonado. When she saw that the call had connected, she began to scream for help.

Maldonado pulled Lester closer to him by her arm, grabbed her phone, and threw it out the open door. The sheriff's department dispatch supervisor testified that the 911 recording of the call included sounds of a woman in distress, background noise like the caller was in a vehicle, and sounds of "scuffling or shuffling" and then the call disconnected. Lester testified that after Maldonado threw her phone out of the car, she grabbed his phone and threw it out of the car so that "they could find him" and "identify who he was."

Lester testified that Maldonado turned right onto a long road with nothing on it. She was terrified because she "felt like either he was going to kill [her], or [she] was going to die jumping out of his car." Lester fought with Maldonado to get control of the car. She tried to put it in park but her attempts failed and she could not find an emergency brake.

Lester was able to get out of Maldonado's grip when her bra strap broke. Lester testified that she thought that if she did not jump out of the moving vehicle she would be raped and murdered. So Lester got as low to the ground as she could and rolled out of the moving car. She testified that she blacked out for a little bit and then ran down the street trying to get help although she was barely able to run. Lester testified that she had a lot of injuries including a fractured spine, road rash over every bony part of her body, and a softball-sized lump on the back of her head. She also had a busted lip, including a cut and bruising, which was caused by Maldonado punching her.

Thomas Loftis testified that he was driving the car that was behind Maldonado's car when Lester jumped out. Maldonado's car was moving fast, veered off the road, and fishtailed wildly. Loftis saw the car's door open and "a body come flying out of it." Maldonado did not stop the car but, rather, drove away. Loftis stopped his car and got out. He saw Lester trying to run towards him but she fell back down. He testified that he believed she was either

3

frightened or in shock. Lester was bleeding through her clothing and was crying. Loftis stayed with her until police and EMS arrived. Loftis was familiar with the area of road where Lester jumped out of the car. He testified that it was rural and pretty empty and he agreed with the State that Lester had jumped out "quite a ways down" the road.

Detective Eric Guerrettaz, the responding officer on the scene, testified that he learned from Lester that both her and Maldonado's phones had been thrown out of the vehicle. Lester was taken to the hospital by EMS. Detective Guerrettaz organized a search for the cellphones with other officers and was able to locate both cellphones. Detective Haynes testified that he identified Maldonado as a suspect based on information he extracted from Maldonado's phone. Lester testified that sometime after she was released from the hospital, she went to the sheriff's office and identified Maldonado in a photo lineup as the person who took her.

Kelly, Lester's ex-boyfriend, was called as a defense witness. Kelly testified on voir dire that he and Lester started dating for about two years before the offense, and that he had met her a couple years prior to them dating. He testified that they dated for some time after the incident but were not in a relationship at the time of trial. In his testimony in front of the jury, he testified regarding his perspective of the events the day of Lester's abduction prior to when Lester got out of Kelly's vehicle. Defense counsel asked Kelly his opinion as to Lester's character for truthfulness or untruthfulness, but the trial court sustained the State's objection to this question based on an improper predicate.

Maldonado testified at trial in his own defense. He testified that when Lester first got in his car, he noticed a cut on her chin, and she told him that her boyfriend had just beat her up. Maldonado testified that after he asked her what had happened with her boyfriend, Lester accused him of working with her boyfriend and told him she wanted to get out of the car.

4

Maldonado testified that he stopped at a subdivision to let Lester out of the car but that she did not get out and instead told him to drive away because her boyfriend was behind them. Maldonado explained that when he pushed her head down, he was trying to get her to put her head down because he thought her boyfriend was following them. He testified that when he pulled back onto the highway after stopping in the subdivision, Lester began hitting him and telling him to stop the car and that she wanted to be dropped off "right there." He explained that he pulled Lester back into the car after she opened the door and began yelling for help because he was going 60 or 70 miles per hour and he thought she was going to jump out of the car. He explained that he threw her phone out of the car because she was hitting him with it. He testified that she took his phone, opened the car door, threw his phone out, and then hit him with a multitool that was on the bottom of his phone. He testified that they fought for control of the steering wheel. Maldonado testified that he hit her to regain control of the car. He testified that Lester jumped into the backseat and then jumped out of the car. He explained that he took off because he thought her boyfriend was behind them. Maldonado testified that he went home and threw away Lester's remaining belongings that were in his possession because he had them for a couple days, had planned to call the police but did not, and did not know what else to do with her belongings.

On cross, Maldonado testified that he did not know at the time that Lester had tried to call 911. The State asked if he had later told his brother that "when I went back on the highway, that's when she was, like, going all crazy and shit and whatever. And then she called the cops or whatever . . . and that's when I took the phone . . . and threw it." Maldonado agreed that he said that but explained that he already had the incident report at that point. Maldonado explained that he had planned to stop at a gas station but that a median was in the way so he

5

turned onto the rural road instead and that he could not turn around because he was fighting for control of the steering wheel. He agreed that they were two miles down the rural road before Lester jumped out. Maldonado admitted that he was familiar with the area and knew that there was nothing on the rural road he turned onto.

After hearing all the evidence, the jury found Maldonado guilty of aggravated kidnapping and assessed punishment at thirty years' imprisonment. This appeal followed.

## DISCUSSION

In two issues on appeal, Maldonado contends that the trial court erred in two regards: when it excluded the testimony of Lester's ex-boyfriend concerning his opinion of her bad character for truthfulness and when it denied Maldonado's request for a jury instruction on the mistake of fact defense.

*Witness testimony on truthfulness*

At trial, defense counsel asked Kelly, the victim's ex-boyfriend, for his opinion of whether Lester was a truthful or an untruthful person. The State objected to the testimony based on an "improper predicate." The trial court sustained the objection, and defense counsel continued questioning Kelly without making any argument in support of the admissibility of the anticipated testimony.

To preserve error for appellate review, a party must present a timely complaint to the trial court stating the specific grounds for the desired ruling if they are not apparent from the context of the complaint. *See* Tex. R. App. P. 33.1(a)(1)(A). Further, the objection made at trial must comport with the issue raised on appeal to be preserved for review. *Sorto v. State*, 173 S.W.3d 469, 476 (Tex. Crim. App. 2005).

6

On appeal, Maldonado contends that the trial court erred when it excluded the opinion testimony because it was admissible as testimony regarding a witness's reputation for truthfulness. *See* Tex. R. Evid. 608 ("A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character."). However, trial counsel did not make any argument regarding Rule 608 in response to the State's objection or the trial court's ruling. Maldonado has not preserved his Rule 608 issue for review. *See Sorto*, 173 S.W.3d at 476.

Maldonado further contends that the trial court erred because the proper predicate was established during voir dire questioning of Kelly outside the presence of the jury when he testified that he had been dating Lester for about two years prior to the offense, had met her two years prior to starting a dating relationship, and dated her for some time after the offense. However, trial counsel did not make any argument that a proper predicate had been established, nor did he attempt to establish a predicate after the objection. Maldonado has not preserved his challenge to the trial court's ruling. *See* Tex. R. App. P. 33.1

Thus, we do not address the merits of Maldonado's first issue. *See Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) ("If an issue has not been preserved for appeal, neither the court of appeals nor this Court should address the merits of that issue.").

*Mistake of fact defense*

Maldonado contends that the trial court erred when it denied his requested jury instruction on the defense of mistake of fact. Specifically, Maldonado's defense theory at trial was that he did not intend to abduct Lester but, rather, was under the mistaken belief that her boyfriend was behind them. The State contends that the trial court properly denied the requested

7

instruction because it was an improper comment on the evidence and Maldonado was not entitled to such instruction.

Jury charge error claims are reviewed under a two-pronged test in which the appellate court must determine: (1) whether the charge was erroneous, and (2) if there was an error, whether the error was harmful to the defendant. *Olivas v. State*, 202 S.W.3d 137, 143–44 (Tex. Crim. App. 2006); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). "A defendant is entitled to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or uncontradicted, and regardless of how the trial court views the credibility of the defense." *Celis v. State*, 416 S.W.3d 419, 430 (Tex. Crim. App. 2013). "In deciding whether a defensive theory is raised, the evidence is viewed in the light most favorable to the defense." *VanBrackle v. State*, 179 S.W.3d 708, 713 (Tex. App.—Austin 2005, no pet.).

The mistake of fact defense is a statutory defense to prosecution when "the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." Tex. Penal Code § 8.02(a). As relevant here, a person commits the offense of aggravated kidnapping "if he intentionally or knowingly abducts another person with the intent to:" "inflict bodily injury on him or violate or abuse him sexually;" or "terrorize him or a third person." *Id.* § 20.04(a). "'Abduct' means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2). "'Restrain' means to restrict a person's movements without consent." *Id.* § 20.01(1). Thus, the aggravated kidnapping statute includes two relevant mental states in addition to intentionally or knowingly abducting a person. *Id.* §§ 20.01, 20.04. As applicable here, the first

8

is to intend to prevent the person's liberation by secreting or holding her in a place where she is not likely to be found. *Id.* § 20.01(2). The second is to have the intent to inflict bodily injury, to violate or abuse sexually, or terrorize her. *Id.* § 20.04(a).

At trial, Maldonado requested a mistake of fact defense instruction and argued, as relevant here, that his mistaken belief that Lester's boyfriend was following them negated the requisite mental state. Specifically, he argued that when he pushed her head into his lap, he did it because he thought the boyfriend was behind them and not because he was trying to secrete her away or sexually abuse her. The trial court determined that a mistake of fact defense instruction was not proper, and it was not included in the charge.

On appeal, Maldonado contends that he should have been given a mistake of fact instruction because his testimony established that he did not intend to abduct Lester with either the intent to secrete her away or with the intent to inflict bodily injury or terrorize her but, rather, he intended to evade her boyfriend who he mistakenly thought was behind them. Maldonado relies on *Miller v. State*, 815 S.W.2d 582 (Tex. Crim. App. 1991), to support his contention that he was entitled to the mistake of fact defense instruction. In *Miller*, the Court of Criminal Appeals held that the defendant charged with kidnapping a child was entitled to an instruction on mistake of fact because the defendant had testified that she believed that the baby's mother was offering the child for an informal adoption and so the defendant took custody of the child with what she believed was the mother's consent. *Id.* at 585. Thus, the defendant's "mistaken belief would negate a conscious objective or desire to abduct the child by restraining the child without parental consent." *Id.*

However, here Maldonado's mistaken belief that he was evading Lester's boyfriend does not negate the mental states relevant to whether he abducted Lester with the

9

intents to either: (1) secrete her away, or (2) harm or terrorize her. First, Maldonado's mistaken belief that the boyfriend was following does not negate his intent to secrete her away without her consent. Specifically, Maldonado admitted during his testimony at trial that Lester asked multiple times to be let out of the vehicle and that he did not stop the car and let her out. His mistaken belief that he was evading the boyfriend can be consistent with the intent to secret her away and thus is a disagreement regarding the evidence but does not negate the requisite intent.

As to the intent to harm or terrorize, Maldonado's testimony that he did not stop because he thought the boyfriend was behind them is an explanation for his behavior but does not negate the intent. If the jury believed he did not intend to harm or terrorize Lester, but instead only intended to evade her boyfriend, then the element of intent would not have been proven. However, his mistaken belief that the boyfriend was pursuing, does not negate his intent to also harm or terrorize Lester, because believing that he intended to evade the boyfriend would not require the jury to find him not guilty. He could hold both intents.

Comparing Maldonado's contentions to the facts present in *Miller*, is illustrative. Miller testified that she believed she had permission of the mother, which directly negated the intent to abduct the child without the mother's consent, as a person would not intentionally take custody of a child both with and without consent. *See Miller*, 815 S.W.2d at 585. Thus, Miller's mistaken belief that she had consent to take custody of the child negated the requisite mental state for the kidnapping offense. Here, Maldonado could have both intended to evade the boyfriend and intended to harm or terrorize Lester. Maldonado's description of events provides a different story and explanation for his behavior but does not negate the "the kind of culpability required for commission of the offense." *See* Tex. Penal Code § 8.02(a).

10

We conclude that the trial court did not err in denying the requested instruction regarding the mistake of fact defense. Because we have concluded there is no trial court error, we do not address the harm analysis in this case. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). We overrule Maldonado's second issue.

## CONCLUSION

Because we cannot reach Maldonado's first issue and overruled his second issue, we affirm the trial court's judgment of conviction.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed:   October 19, 2023

Do Not Publish

11